THE PAXTON CATTLE COMPANY, PLAINTIFF IN ERROR, v. THE FIRST NATIONAL BANK OF ARAPAHOE, DEFENDANT IN ERROR.

1.  **Corporations**: RECOVERY ON NOTE GIVEN BEFORE ORGANIZATION PERFECTED.   Where after articles of incorporation were drawn up and signed by the promoters of a cattle company, but before they were recorded or filed for record in the office of the county clerk, and before the time fixed in such articles for the commencement of the business of such corporation, a president was selected for the corporation, by such promoters, and the president, in the presence and with the approval of all of such promoters, executed and delivered to one M. a note, in payment for, and in consideration of, the sale and delivery of certain horses, cattle, ranch, and other property to said corporation, which, after the perfecting of the said corporation and the time fixed for the commencement of the business thereof, came into its hands as its property, and continued to be used and enjoyed by it as such ;  *Held,* That the endorsee of M. could recover on said note.

2.  **Pleading**: REPLICATION.   Where a defendant in an action alleges by way of answer any matter in bar of the plaintiff's action, the plaintiff may, by way of reply, allege any fact or facts not inconsistent with the facts alleged in his petition, by reason of which the defendant may be estopped to avail himself of such defense.

3.  Negotiable Instruments: CONSIDERATION. The sale and
    relinquishment of an inchoate homestead, or other possessory
    right upon the public domain, together with the ranch and
    other improvements thereon; *Held*, To constitute a good and
    valid consideration for a promissory note.

ERROR to the district court for Red Willow county.
Tried below before GASLIN, J.

*John Dawson* and *Calvin H. Frew*, for plaintiff in error.

*W. S. Morlan*, for defendant in error.

COBB, J.

Plaintiff commenced its action in the district court of
Red Willow county by filing the following petition:

"1.   On the 12th day of July, 1884, the defendant was
justly indebted to one J. B. Meserve, in the sum of five
thousand five hundred dollars, balance due on the sale and
delivery of certain horses, cattle, and a ranch, at that time
sold and delivered to said defendant by J. B. Meserve, and
said defendant then agreed to pay said J. B. Meserve said
sum of $5,500 on the 1st day of April, 1885, with in-
terest at eight per cent; and thereafter, in consideration of
the foregoing, on the 14th day of July, 1884, the defend-
ant, in accordance with the terms of said contract, and as at
the time of said sale, mutually agreed, executed, and deliv-
ered to said J. B. Meserve its promise in writing, in words
and figures following, to-wit:

'PAXTON, ILLINOIS, July 14, 1885.
In consideration of the sale and delivery of all the cat-
tle, horses, and ranch by J. B. Meserve to the Paxton
Cattle Company, of Ford county, Illinois; the said Paxton
Cattle Company promises to pay J. B. Meserve $5,500 on
April 1, 1885, with eight per cent interest, provided said
company has then sold capital stock of said company so as

to have the means to pay the same; and whenever any stock over $23,000 shall be sold then such sums shall be applied on this note of April 1, 1885.

PAXTON CATTLE COMPANY,

By GEORGE WRIGHT, Pres.'

"2.   On the 1st day of April, 1885, defendant had sold capital stock of said company so as to have the means to pay said indebtedness to J. B. Meserve.   Previous to the beginning of this suit, defendant had sold of the capital stock as follows, to-wit:

On the 14th day of July, 1884, $32,200.

On the 3d day of May, 1885, $1,000.

On the 20th day of July, 1885, $22,800.

"Total amount of capital stock sold, $56,000, from which the defendant realized the sum of $56,000.

"No part of said indebtedness has been paid except the sum of $490, on the 17th day of December, 1884.

"3.   On the first day of March, 1886, the plaintiff loaned to the said J. B. Meserve the sum of $4,000, to be repaid on the 2d day of June, 1886, and in consideration of said loan the said J. B. Meserve executed and delivered to the plaintiff his promissory note in writing, in words and figures following, to-wit:

'$4,000.          ARAPAHOE, NEBRASKA, March 1st, 1886.

Ninety days after date, we or either of us promise to pay to the First National Bank of Arapahoe, Nebraska, or order, four thousand dollars, for value received, payable at the First National Bank of Arapahoe, Nebraska, with interest at the rate of ten per cent per annum from maturity until paid.

J. B. MESERVE.'

"And to secure the payment of said promissory note, according to the tenor thereof, the said J. B. Meserve, on the 1st day of March, 1886, sold said claim against defendant, and delivered said instrument in writing of said Paxton

Cattle Company to this plaintiff, by writing endorsed thereon, as follows:

'ARAPAHOE, NEB., March 1st, 1886.

I hereby assign the within obligation to the First National Bank of Arapahoe, as collateral security for the payment of my note of this date, for the sum of $4,000, with the understanding that the said bank shall collect the amount due thereon and apply the amount collected, first, to the payment of my said note, and the surplus is to be paid to me.

[Signed]                                J. B. MESERVE.'

"4.    No part of said debt has been paid, and the plaintiff is now the owner and holder of said obligation of Paxton Cattle Co., by virtue of said sale and assignment, and there is now due the plaintiff from the defendant thereon the sum of $5,315.74, with interest at eight per cent from April 1st, 1885, against said defendant."

On the first day of October, 1886, the defendant filed its answer, setting up "that it is not now, nor was it ever, incorporated; that no meeting for the election of officers or the transaction of any other business was held in the state of Nebraska by the pretended stockholders or directors of said company, the state in which the articles of incorporation were filed, which was on the 11th day of August, 1884, long after the instrument set forth in plaintiff's petition was executed; that the said George Wright, who executed said instrument, was never president of said company or association of persons, and had no authority to sign the said instrument; that at the time of making said instrument the Paxton Cattle Company consisted of the following named persons: J. B. Meserve, the person mentioned in plaintiff's petition, George Wright, Calvin H. Frew, O. D. Sackett; and the said J. B. Meserve had full knowledge of all the facts connected with the attempt of the above named persons to organize as a corporation. Setting up further that the defendant, as a consideration for said instrument and indebtedness, received from J. B.

Meserve cattle and ranch in Chase county, Nebraska, said ranch consisting of fourteen hundred and forty acres, the whole for an agreed sum of thirty-two thousand two hundred dollars, all of which has been paid except the sum mentioned in plaintiff's petition, that said ranch consisted of land held under the United States homestead and pre-emption laws, by persons who agreed with the said J. B. Meserve, for a consideration paid or to be paid, to convey said real estate to him or to the persons to be designated by him; and the said J. B. Meserve, as a part of said agreement, and as a consideration for said instrument mentioned in plaintiff's petition, agreed to obtain and perfect the title to said real estate and have it conveyed to said defendant; all of which was prior to the making proof and obtaining title to said real estate; that at the time of making said agreement said J. B. Meserve occupied and held, under the United States homestead laws, one hundred and sixty acres, as part of said fourteen hundred and forty acres, and agreed to convey said real estate upon the making of final proof and obtaining title to the same, the said company agreeing to furnish the necessary money to pay the expense of obtaining title to said real estate. All of the above agreements in regard to said real estate were fraudulently and corruptly made, for the purpose and with intent of violating the laws of the United States. Said J. B. Meserve has since made proof and has obtained title to said real estate, but has refused and still refuses to convey said one hundred and sixty acres to the defendant. Said one hundred and sixty is reasonably worth the sum of twelve hundred dollars; that defendant has not received title to any of said land except 320 acres; that the balance of said land which J. B. Meserve agreed to obtain the title and convey the same is reasonably worth the sum of seven thousand dollars."

On the 11th day of October, 1886, the plaintiff filed a reply to defendant's answer, to the 2d and 3d counts thereof.

40

"That on the 12th day of July, 1884, Calvin H. Frew, George Wright, J. B. Meserve, and O. D. Sackett agreed on articles of incorporation for said Paxton Cattle Company, and on the said 12th day of July all of said individuals subscribed said articles of incorporation and adopted for said Paxton Cattle Company the name of 'Paxton Cattle Company,' and afterwards, to-wit, on the 12th day of July, 1884, said individuals, for the purpose of completing said corporation and putting it into operation, assembled together and elected said Calvin H. Frew, secretary and treasurer, O. D. Sackett, vice president, and George Wright, president of said company; and from said last mentioned date up to the present time said individuals, and others who have since the 12th day of July, 1884, associated themselves with said individuals and purchased capital stock of said company, have retained and assumed the name of 'Paxton Cattle Company,' and acted in a corporate capacity, with a full set of corporate officers, acting as such from said last mentioned date up to the present time.

"2d.   And on said 12th day of July, 1884, when said individuals were assembled as aforesaid, they elected the following board of directors, to-wit: George Wright, Calvin H. Frew, O. D. Sackett, and J. B. Meserve, and assumed full corporate powers, and at various times since have elected officers, bought, sold, and held property as a corporation, and each and every day from said 12th day of July, 1884, up to the present time, said individuals and this said association have represented themselves to be duly incorporated under the name of the 'Paxton Cattle Company,' and have assumed to be and acted as a corporation; and the same George Wright, from the time of his election as president of said company as aforesaid, up to the present time, has assumed to be and acted as president of said company, and is the only person who has acted as such officer or been recognized as president of said company.   After the election of said officers and directors, to-wit, on the

12th day of July, 1884, said individuals owning all the capital stock of said company, and claiming to be duly incorporated under said name of 'Paxton Cattle Company,' and acting in a corporate capacity, at a meeting when all of said individuals and officers were present, for the benefit of said corporation, agreed to buy the horses, cattle, and ranch named in plaintiff's petition and defendant's answer, and pay the said J. B. Meserve therefor the amount of twenty-six thousand dollars; and it then and there paid the said J. B. Meserve all of said $26,000, excepting the sum of $5,000; and said George Wright, on the 14th day of July, 1884, in the presence of all the officers and indi-.viduals of said company, and under their direction and procurement, and with the consent of each and every officer and individual of said company, signed the instrument in writing set out in plaintiff's petition as president of said company, as evidence of the debt due said J. B. Meserve by said company. Said J. B. Meserve entered into said contract with said company as a corporation duly incorporated, and accepted said instrument in writing subscribed by said George Wright as president of said Paxton Cattle Company, as the promise in writing of said company, duly incorporated. At the time of the meeting of the individuals aforesaid, on the 12th day of July, 1884, it was the agreement and understanding between all of them that said Paxton Cattle Company would in all respects duly incorporate, and from said 12th day of July, 1884, up to the present time, said company has assumed, exercised, and practiced all the powers, privileges, and rights of a corporation duly incorporated under the laws of the state of Nebraska. And said instrument of writing, subscribed by said George Wright as president, was assigned to said plaintiff under the representation to this plaintiff that said company was duly incorporated; and this plaintiff, relying on said representations and the long and continued use on the part of said defendant of said corporate powers and

privileges, accepted the assignment of said instrument and debt as collateral security for the note of J. B. Meserve set out in the petition. The said J. B. Meserve has fully performed and complied with all the terms of the contract on his part entered into between him and said company, and said company, from the 14th day of July, 1884, up to the present time, has accepted the result of said contract with said J. B. Meserve, and kept and retained possession of all the horses, cattle, and ranch mentioned in said petition, and has enjoyed all the benefits, rights, privileges, and advantages of said contract from the 14th day of July, 1884, up to the present time, with no other authority, right, title, or consideration than that derived through said contract with said J. B. Meserve. Since the filing of the articles of incorporation of said company in the office of the county clerk of Red Willow county, to-wit, on the 17th day of December, 1884, and at divers other times previous to filing the petition in this action, said defendant promised to pay the said J. B. Meserve the balance remaining due on said contract as set forth in said petition.

"2d. Plaintiff denies each and every allegation of 2d and 3d defenses in defendant's answer, not herein before specifically admitted."

There was a trial to the court with a finding and judgment for the plaintiff. A motion for a new trial having been overruled, the defendant brings the cause to this court on error, and assigns the following errors:

"1st. The court erred in refusing to grant a new trial in this case.

"2d. The court erred in giving judgment for the plaintiff upon the note in question, because it was given before the articles of incorporation were filed, and before the day fixed in the charter for the company to commence doing business, and before $30,000 of the capital stock had been paid in as required by its charter.

"3d. The court erred in permitting the defendant to

prove the new matter set up in the reply, because it stated a different cause of action from that stated in the petition.

"4th. The court erred in giving judgment for the defendant on the note before it was due.

"5th. The court erred in giving judgment for defendant, because the note was given for an illegal consideration.

"6th. The court erred in giving judgment for defendant when the petition did not state facts sufficient to constitute a cause of action."

Upon the trial there was introduced in evidence an agreed statement of facts, which is too lengthy to be inserted here, in full. Such parts of it only will be given as are deemed necessary to an understanding of the points relied upon. From such statement it appears that on the 12th day of July, 1884, Calvin H. Frew, O. D. Sackett, J. B. Meserve, and George Wright met at the office of Calvin H. Frew, in Paxton, Illinois, for the purpose of forming a corporation to be known as the "Paxton Cattle Company." And thereupon said parties agreed upon articles of incorporation as follows:

*    *    *    *

"ART. 2. The principal place of transacting the business of this incorporation shall be at Paxton, Ill., with a branch office at McCook, Neb.

*    *    *    *

"ART. 5. This incorporation shall commence its business on the 15th day of July, 1884, and shall terminate on the 15th day of July, 1904, unless sooner dissolved or renewed by a vote of two-thirds of the stock."

*    *    *    *

These articles were signed by all of the above named persons, and were recorded in Red Willow county on the 11th day of August following.

On the said 12th day of July, 1884, the said incorporators, being all present, proceeded to elect the officers of said company, and elected George Wright, president; O. D.

Sackett, vice president; Calvin H. Frew, secretary and treasurer; and a board of directors as follows: George Wright, Calvin H. Frew, O. D. Sackett, and J. B. Meserve. That on said day said J. B. Meserve agreed to sell to the said Paxton Cattle Company, and did sell and convey to said company by bill of sale then and there executed and delivered, certain cattle, saddle ponies, mules, wagons, harness, "ranch equipments, cook stove, dishes, chains, tents, lumber, houses, sheds, fences, and everything else on said Meserve's ranch in Chase Co., Nebraska, on Frenchman river;" and it was then and there agreed that said Paxton Cattle Company should pay to said J. B. Meserve for the property that day agreed to be sold by said J. B. Meserve to said Company, the sum of twenty-six thousand dollars, and that the said J. B. Meserve should take in payment therefor the sum of ten thousand dollars in the capital stock of said company, at par, the remaining amount to be paid to him in money; and thereupon said J. B. Meserve executed and delivered to said Paxton Cattle Company the bill of sale above set forth; and thereupon the said J. B. Meserve, as manager for said Paxton Cattle Company, took possession of the ranch mentioned in said bill of sale, and all the horses, cattle, and personal property thereon, that had formerly belonged to J. B. Meserve; and the said Paxton Cattle Company, from the said 12th day of July, 1884, up to the present time, has kept possession of said ranch and property, and kept and retained possession of all the horses and cattle mentioned in said bill of sale, and has enjoyed all the benefits, privileges, and rights of said sale up to the present time, with no authority, title, or consideration other than that derived from said J. B. Meserve; that on the 14th day of July, 1884, at a meeting of all the officers and stockholders of said Paxton Cattle Company, the said company not having paid the amount still remaining unpaid to said J. B. Meserve, and there being still the sum of five thousand

five hundred dollars unpaid, George Wright, its presi-
dent, in the presence of and with the consent of all parties
claiming to act as officers or stockholders of said company,
executed and delivered to said J. B. Meserve the instru-
ment in writing sued on in this action; that there was
paid in of the stock of said company as follows: On the
14th day of July, 1884, there was sold and paid into the
capital stock of said company twenty-six thousand dollars,
and no more on that day; on the 30th day of May, 1885,
one thousand dollars more of the capital stock of said com-
pany was sold and the amount paid in cash; on the 20th
day of July, 1885, there was sold of the capital stock of
said company $22,800 to various parties, as follows: To
C. D. Fuller, $3,400; F. E. Cawley, $3,300; James K.
Work, $5,100; to Dwight H. Loomis, $5,000, and $600
in addition to other parties. This stock was paid for by
cattle delivered to and taken possession of by said company
on the 20th day of July, 1885.

"That on the 1st day of March, 1886, the plaintiff
in this action loaned to J. B. Meserve the sum of $4,000,
to be paid on the 2d day of June, 1886, and in consid-
eration of said loan said J. B. Meserve executed and de-
livered to said plaintiff his promissory note set out in his
petition in this action; and to secure the payment of said
promissory note, according to the tenor thereof, said J. B.
Meserve on the said first day of March, 1886, sold said
claim against defendants, and assigned and delivered the in-
strument in writing of said Paxton Cattle Company to the
plaintiff, by writing endorsed thereon as set out in the pe-
tition; and afterwards, on the 31st day of August, 1886
said J. B. Meserve renewed the said note to the plaintiff,
and there is still due on the renewal of said note of said
J. B. Meserve to said plaintiff the sum of $4,000, and that
said instrument in writing signed by George Wright, and
set out in the petition, is held by the plaintiff as collateral
security for said last mentioned note by said J. B. Meserve

to said plaintiff; and that there has nothing been paid on the instrument purporting to be executed by said Paxton Cattle Company and signed by George Wright, president, except the sum of $490 on the 17th day of December, 1884; that the meeting on the 12th day of July, 1884, when said pretended articles of incorporation were acted upon and signed, was held in the town of Paxton, Ford county, in the state of Illinois, and that the pretended election of officers was held in the said town and state; and that there has been no meeting of the pretended stockholders or directors of said company ever held in the state of Nebraska or in the town of McCook; that said articles of incorporation were never filed in the office of the county clerk of Red Willow county, Nebraska, until the 11th day of August, 1884, nor were said articles filed at any other place; that said George Wright, who signed the instrument set out in plaintiff's petition, pretended to act by the authority of an election held in the town of Paxton, Illinois, on the 12th day of July, 1884, and by no other official authority whatever; that at the time of the delivery of the bill of sale above mentioned by J. B. Meserve, there was also delivered by said J. B. Meserve to the Paxton Cattle Company an agreement in words and figures following:

"'Articles of agreement made this 12th day of July, 1884, between J. B. Meserve, of McCook, in Red Willow county, Neb., party of the first part, and Paxton Cattle Company, of Paxton, Ford county, Illinois, party of the second part, witnesseth: that the party of the first part has bargained, sold, and will convey and deed, if so desired, with release of homestead and release of dower by the wife of said first party, unto second party, all his interest, right, title, or claim of any nature or kind whatsoever, in and to the following real estate, to-wit: W $\frac{1}{2}$ of nw $\frac{1}{4}$ of section 11, and sw $\frac{1}{4}$ of sw $\frac{1}{4}$ of section 2, and n $\frac{1}{2}$ of ne $\frac{1}{4}$ of section 10, and n $\frac{1}{2}$ of nw $\frac{1}{4}$ and sw $\frac{1}{4}$ of nw $\frac{1}{4}$ of section 10, and n $\frac{1}{2}$ of ne $\frac{1}{4}$ of section 9, and south half of se $\frac{1}{4}$ of section 4, and the s $\frac{1}{2}$

of the s ½ of section 3, and sw ¼ of section 4, and se ¼ of section 5, and sw ¼ of section 5, and nw qr of ne qr of section 8, and n ½ of nw qr and sw qr of nw qr of section 8, and ne qr of section 7, and sw qr of section 6, each and all of said pieces being in town 5, range thirty-six west, in Chase county, Neb., lying along both sides of the Frenchman river; and second party is to be at all expense and outlay in perfecting the title to said land, and second party as the owner of said land, so far as first party's interest therein is concerned, has the sole control thereof; and first party covenants and agrees to do all he can to obtain and perfect the title to said land in and to the second party.

"'J. B. MESERVE.

"'PAXTON CATTLE COMPANY,

"'By GEORGE WRIGHT, President.'

"That the legal title to the land mentioned in said contract was in the government of the United States at the time of the delivery of the same, and was held by various persons who had filed thereon under the homestead, preemption, and timber culture laws of the United States; that at the time of the execution and delivery of said contract, J. B. Meserve had a homestead entry on the south-west quarter of the south-west quarter of section 2, the north-west quarter of the north-west quarter of section 10, and the north half of the north-west quarter of section eleven, in township 5, range thirty-six west, in Chase county, being a portion of the land mentioned in said agreement; that since the delivery of said contract by said J. B. Meserve, the said J. B. Meserve has made proof upon said land described, and has received a receiver's final duplicate receipt from the receiver of the United States Land Office at McCook, Nebraska, but no patent has ever been issued to said J. B. Meserve therefor, and he has not conveyed nor attempted to convey since the making of said contract any title to said land to the Paxton Cattle Company; that the

money necessary to prove up on said land was charged up to the Paxton Cattle Company; that the said J. B. Meserve, at the time of making the instrument set out in plaintiff's petition, sold to the Paxton Cattle Company, as shown by said agreement and bill of sale, in a lump, or as an entire consideration, for the sum of $26,000, the ranch, houses, horses, cattle, and other property mentioned in the bill of sale and agreement; that since the making of said agreement the Paxton Cattle Company has received the title to but 320 acres of said land mentioned in said agreement."

On the trial it was proved, on the part of the plaintiff, over objection by defendant's counsel, that the Paxton Cattle Company have ever since the 12th day of July, 1884, had persons who claimed to be officers of said company; that George Wright has claimed to be president of said Paxton Cattle Company.

Calvin H. Frew testified on the part of the defendant as follows:

"I have seen the agreement in regard to the land. I drew it. There was an agreement in addition to that put in writing in regard to the land mentioned in the agreement; he agreed to convey the land and perfect the title to the same to the Paxton Cattle Company. He was to get parties to take the timber claims; he was to work the lands and turn them over to the company the same as money. The company was to be at the expense. The company for Meserve was to procure the men to make those proofs. He objected to this going into the agreement. He said if that was written in the contract it might affect the title. He said it would leave the claims liable to contest. Meserve said at the time he made the contract the ranch was worth from $6,000 to $10,000. His own homestead was worth from twelve to fifteen hundred dollars. He (Meserve) said it was worth that much; that he could borrow $1,000 on it. The quarters the company got cost them $210 to $214 over and above what he paid the other parties.

Paxton Cattle Co. v. First National Bank.

"There were other persons claiming interests and rights to the property of the company besides Sackett, Wright, and J. B. Meserve. Other parties have purchased 10 shares, and they were purchased subsequent to the making of the instrument set out in the petition. The company has had no money at all; once or twice sold some cattle to pay up the debts. Only $1,000 of the capital stock was paid for in cash."

All of the above evidence was objected to by plaintiff as irrelevant, incompetent, and immaterial. Objection overruled and exceptions taken.

"Mr. Meserve has always met with us in Illinois, always except the last meeting or two. It is the same Meserve who acted as secretary and manager of the company. He still has interest in the company, and had at the commencement of this action.

"I estimated the value of the ranch lots of times. I don't think I estimated it at $6,000. We had one meeting on Saturday and then on Monday, in Illinois; had a meeting in November and December, 1884. I think perhaps we had another. We had a meeting to borrow some money in the year 1885. We had two or three meetings; then in 1886 we had just one meeting.

"We had to abandon our ranch. At the last meeting Mr. Meserve was elected secretary at Buckley, Illinois. I suppose he has had the custody of the papers. I suppose Meserve has kept the books at McCook. I think I know my own handwriting. I wrote the following letter. I have not the letter to which this is an answer. I could not tell whether I kept this letter. I don't pretend to keep all my letters. I keep some, and sometimes I keep them for awhile and then destroy them. I did not bring any letters with me in relation to the controversy."

Said letter was then introduced in evidence, which read as follows:

"PAXTON, ILL., Oct. 13th, 1885.

"*D. M. Tomlin, Esq., Cashier First National Bank, Arap-
ahoe, Neb.:*

"DEAR SIR—Yours of 12th received. In reply I have
to say, 1st, it is not possible for the company to pay that
note now ; 2d, it is not due, notwithstanding it provides to
be paid April 1st, 1885. If Hon. J. B. M. will sell shares
in the company which he agreed to do for the cash, the money
can be applied to pay that note. He can do so if he tries.
It may be you are not informed about the merits of this
note, but Mr. M. has not even had the temerity to ask us
himself for it. It can't by law be collected now.

"Very Respectfully,

"CALVIN H. FREW,

"*Secretary and Treas.*"

"At the time we made the contract with Meserve I did
not know how much money the company had in the treas-
ury. I was elected secretary and treasurer, and I suppose
I acted in that capacity. I suppose I signed the paper as
secretary."

Q. When did you, or any member of the company,
ever deny being an incorporation?

Objected to by defendant as immaterial, irrelevant, and
not proper cross-examination. Objection overruled, and
defendant excepts.

A. I don't know.

Q. In whose name were the cattle held the last two
years?

Objected to as not proper cross-examination. Overruled,
and defendant excepted.

A. I suppose the Paxton Cattle Company thought it
had some rights to it then. Debts were created every day
in my name, in the name of George Wright, O. D. Sack-
ett, J. B. Meserve, and John A. Koplins.

On re-direct examination defendant asked the following
question :

Q. · When was Mr. Frew secretary and treasurer?

Objected to as immaterial and irrelevant by plaintiff, and objections sustained, to which defendant excepted.

There was further evidence on the part of the plaintiff in rebuttal; but the foregoing is deemed sufficient for the purpose of a proper consideration of the grounds of error relied on.

As I understand the case, there is but one important point involved in it. It is not denied, nor can it be under the pleadings, admissions, and evidence, that long before the commencement of this action the plaintiff in errror had been in existence both *defacto* and *dejure* as a corporation, under the laws of this state; but the contention is, that the action can not be maintained, for the reason that the instrument sued on was executed and delivered in point of time nearly one month before the filing and recording of the articles of incorporation of said company, and one day, in point of time, before that provided for in said articles for the commencement of the business of said incorporation. It is not denied that the consideration for which said instrument was given passed to the possession of said corporation and has been retained and enjoyed by it. ·

I have carefully examined the numerous cases cited by counsel for the plaintiff in error, to the proposition that " There could be no incorporation until the articles of incorporation were filed in the county clerk's office, as there should be a substantial compliance with the statute before the corporation could be considered *in esse.*" This proposition is sustained by the cases of *Abbott v. Omaha Smelting Co.,* 4 Neb., 416; *Harris v. McGregor,* 29 Cal., 124; *Douthitt v. Stinson,* 63 Mo., 269, and *Stowe v. Flagg,* 72 Ill., 397; also *Bigelow v. Gregory,* 73 Id., 197. But these are all cases where parties were sued, either as natural persons or as partnerships, and sought to defend by pleading or proving corporate rights or powers. In all such cases I think it is held that the party alleging or relying upon such cor-

porate existence must prove at least a colorable com-
pliance with all provisions of law upon which such
corporate existence is made to depend.   In the case at bar
the Paxton Cattle Company is sued as a corporation, and
sought to be held responsible for corporate acts antedating
its legal existence.   In other words, it is sought to make
it pay for property of which the corporation found itself
in possession upon coming into legal existence; and that at a
price and upon terms, in the agreeing upon and fixing
which, it had not, nor could have had, any legal voice.

There are well recognized principles of law under which
this may be done, supported by a line of well considered
cases, both American and English.   I will quote from two
of these cases, one of which is cited by counsel for plaint-
iff in error, in which it is held that the promoters of a
future incorporation, while the same exists only in prospect,
may contract obligations by which the corporation, when
legally organized, will be bound.

The case referred to is that of *Bell's Gap Railroad Com-
pany v. Christy*, 79 Pa. St., 54.   I quote from the sylla-
bus:   " Where a number of persons not incorporated, but
associated for a common object, intending to procure a
charter, authorize acts to be done in furtherance of their
object by one of their number, with the understanding that
he should be compensated, if such acts were necessary to
the organization and its objects and are accepted by the
corporation and the benefits enjoyed, they must be taken
*cum onere* and be compensated for."

In that case, while the court denied the claim of the
plaintiff for compensation · for his services in making a
pioneer survey of a route for a railroad, and procuring a
charter for the company, etc., it did so for the reason that
such services were procured and acquiesced in by less than
a majority of the active promoters of the scheme.   In the
opinion the court say:   " We do not desire to controvert
the principles established in England, and to some extent

recognized in this country, that when the projectors of a company enter into contracts in behalf of a body not existing at the time, but to be called into existence afterwards, then, if the body for whom the projectors assumed to act does come into existence, it cannot take the benefit of the contract without performing that part of it which the projectors undertook that it should perform."

The case of *Low v. Railroad*, 45 N. H., 370, is quite in in point. The leading facts of the case may be shortly stated thus: The legislature of Vermont, in November, 1835, passed an act incorporating the Connecticut and Passumpsic Rivers Railroad Company, with power to construct a railroad from the south boundary of Vermont up the valleys of the Connecticut and Passumpsic to the north line of the state, the capital to be $2,000,000, and the act to be void unless $20,000 should be expended on the road within five years. Nothing having been done under the act, by an act of Oct. 31, 1843, the corporation was revived, subject to a similar condition, and Messrs. Fairbanks, Hall, and others were appointed commissioners to open books and receive subscriptions to the capital stock of the company. Near the close of the year 1844, for reasons stated in the case, there commenced a great revival of interest in the said line of railroad, and the plaintiff being largely concerned in business in Brantford, Vt., was engaged in the effort to awaken an interest in the enterprise of building the said railroad. Says the statement of the case: " The evidence tended to show that he collected maps, charts, and statistics showing the feasibility of the road and the probable amount of transportation upon it ; that he was active in getting up meetings, public and private, of those interested at various places where the road was supposed likely to pass, at which meetings he was present and laid before the people assembled the material and data he had collected; and was successful in exciting a general interest and attention to the project. At some of these meetings Mr. Low sug-

gested to the persons present who took the principal lead in the movement the necessity of some person being employed steadily in visiting and stirring up the people in the different towns interested, in Vermont and New Hampshire, in visiting Boston and Canada, and inviting the attention of the capitalists to the advantages of the road, and generally in forwarding the enterprise; that they all assented to the suggestion and to the urgent need of such exertions, and suggested to Mr. Low that he was the man, and the only man, who could successfully accomplish the object. Mr. Low stated his anxiety for the road and his willingness to do what he could consistently, with due attention to his business; but that his business was large, requiring almost his whole time, and that he could not afford to devote his time to the railroad, as it was necessary that some one should do. To which they replied that he must make it his business to push forward the road, and assured him if he would do so he should be abundantly compensated for his services and expenses. Mr. Low testified that he always expected to be fully compensated and paid by the railroad company, for his time and labor and neglect of his own business, and that he devoted to this object almost all his time, from Jan. 1, 1845, till the organization of the corporation on the 15th day of January, 1846.

"The gentlemen who gave these assurances to Mr. Low were not corporators named in the charter, and no meeting of the corporation had been held, or association formally admitted; but they were active favorers of the enterprise, intending to become stockholders, and actually taking shares in it when the books were opened.

"The evidence tended to show that Mr. Low visited Boston and spent many weeks there, laboring to enlist the co-operation of men of capital there; that he visited many places in the vicinity of the route, and in Canada, to unite their efforts and to encourage subscriptions." There was evidence of other services rendered by Mr. Low of the

same general character; also, that to enlist the aid of one Harrison Gilmore, of Boston, he agreed to give him his best horse whenever the cars should run into Brantford, and that he accordingly did give him such a horse, which he testified was worth from $200 to $250.

After the organization of the company Mr. Low presented an account to the president, who was also disbursing agent for the company, for his expenses during the time for which his service was charged, which was allowed and paid; and at the same time he stated to the president that he had a claim for his services, and requested that it should be settled. This was not done, and the suit was finally brought for the value of such services and of the horse above referred to.

"The court charged the jury that by the charter all associates are corporators; that by the law of Vermont each corporator is charged with the duty of rendering all necessary service to carry out the provisions of the charter and to effect an organization; and that if any one performs necessary labor, and expends money in the discharge of such duty, and his action is assented to by the corporators, or, being known to them, is not objected to, and the corporation is organized and enjoys the benefit of such services, the law implies a promise to pay for them; that every person interested in the object for which an act of incorporation is granted, and who, with the knowledge and without the objection of the corporators, and with the assent and at the request of some of them, shall unite in assisting in the organization of the corporation, with a *bona fide* intention of becoming a member, by taking stock, and shall, as soon as books are opened, take stock, by subscribing for shares, is to be deemed an associate from the commencement of his labors, within the purview of the act of incorporation in this case, so far as the liability of the corporation for his services is concerned; that in this case, if some few of the corporators mentioned in the charter

requested the plaintiff to perform the services now in suit, or if the greater number of those who, like himself, became associates, and in the manner that he did—by subscribing for stock in the road and becoming members of the corporation, either requested the plaintiff to render such services, or knew of them and assented thereto, he will be deemed to have sufficient authority to render the services, and the law will raise a promise of the corporation to pay for said services, if necessary and reasonable."

To this instruction the defendant excepted.

"The defendant requested the court to instruct the jury that, prior to the organization no person, or persons, were competent to bind the corporation by contract, express or implied; that prior to the organization it would require the concurrence of a majority of the corporators named in the charter to bind the corporation by contract; that no subscription for stock could make the subscribers associates within the meaning of the charter before organization; that no intention to subscribe for stock, nor any acts done in furtherance of the objects of the enterprise could have that effect; that no one would become an associate within the meaning of the charter except after the organization, by being a subscriber for stock; that the corporation would be bound by no implied contract arising before organization; that the plaintiff is not entitled to recover anything on account of the horse delivered by him to Addison Gilmore, nor for the service performed at Montpelier in procuring a division of the charter, being of the kind called 'logrolling.'"    *    *    *    *    *    *

The court declined to give this instruction, to which the defendant excepted.

"But the court did instruct the jury that the corporation would be bound to pay for the horse delivered to Gilmore if they found upon consideration of all the evidence, and the nature of the employment, that Low was authorized to make such a contract in behalf of the corporation and

did so make it, and not otherwise.        *        *        *

The jury returned a verdict for the plaintiff which the defendants move may be set aside by reason of the preceding exceptions."

The court in the opinion say :

" The great question is, whether the plaintiff is entitled to recover of the incorporation, in any form, for services rendered by him antecedent to its organization, but which were necessary to. enable it to complete that organization; and if so, whether the action of assumpsit can be maintained.

"In considering the first question it will be assumed for the present that the services were necessary, that they were rendered at the request of one or more of the original corporators or of those who were associated with them, and that the corporation accepted those services after its organization, and enjoyed the benefits of them.    Under such circumstances we are inclined to the opinion that it would become the duty of the corporation to pay for such services, and that in some form this duty could be enforced.

*        *        *        *

" In such case it can avail nothing by way of defense, to show that in fact the party had no capacity to make such antecedent request, or to bind himself by a contract, as in the case of a corporation that was not organized at all, or imperfectly, any more than to show that in point of fact there was no such request or no contract made.    But the promise is implied by law from the fact that the party, when it *had* capacity to contract, has taken its benefits, and, therefore, must be deemed to have taken its burthens at the same time; and he is estopped to controvert it either by showing a want of capacity to make a contract, or that none in fact was made.    Upon the same principle a person entering into a contract with a corporation in their corporate name is estopped to deny that it is duly constituted.    *    *    *    The case of an infant is in point.    He has not

capacity to bind himself by a contract except for necessities, but if after he arrives at full age he apply the goods to his use he is bound to pay as he had promised. So, here, if the corporation, after its organization, has elected to receive the benefit of services rendered for it prior to such organization, the law may well imply a promise to make reasonable compensation for them."

I have quoted at great length from the above case because it seems to be very nearly or quite in point to the case at bar. When, under a general incorporation law, persons have drawn up and signed articles of incorporation, but have not yet filed them in the office of the county clerk, the status of the corporation is the same as where, under a different constitutional provision, a charter has been granted by special legislative enactment, but no organization has been effected under it.

From the agreed statement of facts above set out, it appears that after the articles of incorporation had been drawn up and signed by all of the promoters of the scheme and a full set of officers for the corporation had been elected, but before the said articles were filed in the county clerk's office, and before the time fixed for the commencement of the business of the corporation, the said officers and promoters entered into a contract with Meserve for the purchase on the part of the corporation of the cattle, horses, ranch, claims, and other property in Chase county, as stated in the agreed statement of facts, and in part payment therefor, by the president elected for said corporation, executed and delivered to him the note sued on. It is very clearly shown, both by the agreed statement of facts and other evidence, that the organization of the said Paxton Cattle Company was afterwards perfected by the filing of their articles of incorporation in the county clerk's office of Red Willow county, and that the company, through its officers and manager, has retained the possession of the property in Chase county, both real and personal, for which

the said note was given. This, under the authority of the foregoing cases, is the turning point in the case, and I think the conclusion is inevitable, granting the entire want of power on the part of the officers and promoters of the corporation to act as such at the date of the note, that the retaining possession of the consideration by the corporation after its organization is a ratification of the contract with all of its terms and obligations.

The plaintiff in error also makes the point that "The court erred in allowing the defendant in error to prove the new cause of action set up in the reply." I do not understand the matters set up in the reply as constituting a new cause of action, but only as stating facts in reply to the defense set up by the corporation defendant.

Bliss, in his work on Code Pleading, sec. 396, defines a departure to consist "in leaving the case as made in the complaint or petition in respect to some material matter, and introducing new matter which is inconsistent with, or which does not support it." This, he says, "will not be permitted." It is true that it is alleged in the petition that the note was executed and delivered by the corporation. The answer alleges that at the time and date of the execution of the note the corporation was without capacity to contract, or even legal existence. By the reply the plaintiff alleges facts which under the law estops, or at least denies, to the defendant the right to avail itself of that defense. This, I think, is one of the proper offices of a reply. It by no means abandons the cause of action as originally pleaded, but fortifies it by the new facts rendered necessary by the allegations of the answer.

The defendant also makes the point that "The contract was void for illegality, as it was intended to violate a statute of the United States. All of the ranch of 1,440 acres was, at the time of making the contract, held under the timber culture, homestead, and pre-emption laws of the United States," etc.

It is provided by statute, section 1, chapter 38, Compiled Stats., that " All contracts, promises, assumpsits, or undertakings, either written or verbal, which shall be made hereafter in good faith and without fraud, collusion, or circumvention, for sale, purchase, or payment of improvements made on the lands owned by the government of the United States, shall be deemed valid in law or equity, and may be sued for and recovered as in other contracts." This section was construed by this court in the case of *McWilliams v. Bridges*, 7 Neb., 419. I quote the statement of the facts of the case from the opinion : "The evidence shows that the consideration for giving the promissory note in question was the sale and surrender by Daniel A. Bishop of his unperfected homestead claim upon the public lands, together with the improvements thereon consisting of a small dwelling house, or shanty, about twenty-five acres of breaking, and a lot of forest trees." Also from the syllabus : "The sale and surrender of a homestead claim upon the public lands, together with the improvements made thereon, although conveying no interest in the land itself as against the government, is a good consideration for a promissory note; the improvements being subjects of legitimate bargain and sale."

This case clearly recognizes it to be the law, where a note or other obligation is given, partly in consideration of the release of an inchoate homestead or other claim on the public lands, and in part for improvements or other property on said lands, the instrument will be enforced.

This case is followed by that of *Simmons v. Yurann*, 11 Id., 516, and the more recent one of *Carkins v. Anderson*, *ante* page 364.

The judgment of the district court is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.